# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
~~MANHATTAN DIVISION~~

| | |
|---|---|
| **DR. AMRA SABIC-EL-RAYESS**, <br><br> *Plaintiff,* <br><br> v. <br><br> **TEACHERS COLLEGE, COLUMBIA UNIVERSITY**, <br><br> *Defendant.* | **Case No. 1:24-cv-02891-JMF** <br><br><br> ~~SECOND~~THIRD **AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff Dr. Amra Sabic-El-Rayess ("Plaintiff" or "Dr. Sabic-El-Rayess"), by and through her undersigned attorneys, Sanford Heisler Sharp McKnight, LLP, brings this action against Defendant Teachers College, Columbia University ("Defendant," "TC," or "the College"). Plaintiff alleges upon knowledge concerning her own acts and upon information and belief as to all other matters.

I.    **INTRODUCTION**

1.    Teachers College is the oldest and largest graduate school of education in the United States. It is ranked as the number one graduate school of education in the country.[1]

2.    On its website, TC claims that its mission is: "[t]o empower committed learners and leaders to build a . . . more just and equitable world through multidisciplinary knowledge creation, policy engagement, and practice innovations across education, psychology, and health."[2]

---

[1] *2024 Best Education Schools*, U.S. News & World Report, https://www.usnews.com/best-graduate-schools/top-education-schools/edu-rankings (last visited ~~June 26, 2024~~Jan. 27, 2025).

[2] *Our Mission*, Teachers College, Columbia University, https://www.tc.columbia.edu/about/ (last visited ~~June 26, 2024~~Jan. 27, 2025).

3.      The College touts diversity, inclusion, and social justice as central to its core values. For example, TC claims on its website that it "strives to establish an institution that actively attracts, supports, and retains diverse students, faculty, and staff, demonstrated through its commitment to social justice, its respectful and vibrant community, and its encouragement and support of each individual in the achievement of their potential."[3]

4.      TC's mistreatment of Dr. Amra Sabic-El-Rayess, a faculty member with a tremendous bench of achievements, highlights that the College pays lip service to its professed values of diversity and inclusion. Rather than actively support Dr. Sabic-El-Rayess in achieving her potential, the College has precluded her from promotion to tenure-track status by confining her to non-tenure-track positions for over a decade and subjecting her to persistent discrimination based on her Muslim religion and age.

5.      Dr. Sabic-El-Rayess is a ~~48~~49-year-old Bosniak[4] woman of Muslim religion and creed who survived the Bosnian Genocide and immigrated to the United States as a young adult.

6.      She is also a highly acclaimed scholar and writer, who has secured numerous accolades and garnered praise from influential leaders and institutions.

7.      For example, in a letter addressed to Dr. Sabic-El-Rayess, President Joseph R. Biden applauded her, writing: "I am inspired by the bravery and strength you have shown in the face of heartbreaking tragedy and persecution." Reflecting on Dr. Sabic-El-Rayess's award-winning memoir, *The Cat I Never Named: A True Story of Love, War, and Survival*, he hailed her as "the very idea of America" itself.

---

[3]  *Diversity & Community*, Teachers College, Columbia University, https://www.tc.columbia.edu/about/diversity-and-community/ (last visited ~~June 26, 2024~~Jan. 27, 2025).

[4]  The Bosniaks are a South Slavic ethnoreligious group that is characterized by its historic ties to the Bosnian historical region, adherence to Islam, and the Bosnian language.

8.      Dr. Sabic-El-Rayess's memoir is regularly taught in middle schools and high schools throughout the United States.

9.      For over a decade, Dr. Sabic-El-Rayess has worked as a non-tenure-track Associate Professor of Practice, Research Professor, Research Scientist, and/or Lecturer at TC, where she teaches, researches, and publishes on a range of issues in education, including educational displacement, hate prevention, and storytelling.

10.     During her time at the College, she has amassed an impressive set of accomplishments that distinguish her from her peers and outpace the contributions of many tenure-track and even tenured professors.

11.     For instance, she has secured multi-million-dollar grants to conduct cutting edge research, published a best-selling and critically acclaimed memoir and numerous peer-reviewed articles, recently published a second best-selling memoir, spearheaded the creation of a research laboratory while collaborating with centers at the forefront of her field, and served in multiple leadership positions.

12.     Dr. Sabic-El-Rayess is objectively qualified for a tenure-track position at the College.

13.     Over the years, a number of TC leaders, including TC President Thomas Bailey, have concurred that Dr. Sabic-El-Rayess is qualified for a tenure-track role.

14.     Nonetheless, TC has repeatedly rejected Dr. Sabic-El-Rayess's applications for tenure-track positions and dissuaded her from applying for such positions on the basis of her Muslim religion and age.

15.     At TC, tenure-track and tenured status confers significant benefits and advantages that Dr. Sabic-El-Rayess does not receive as a non-tenure-track Associate Professor of Practice.

16.     Achieving tenure is the ultimate form of promotion for a professor at TC, because with tenure comes the freedom to freely pursue innovative research and topics without the risk of losing one's job based on the type of research that the professor pursues.

17.     A non-tenure-track Associate Professor of Practice position is temporary, whereas a tenure-track or tenured position is one from which an individual cannot be easily fired.

18.     Upon information and belief, non-tenure-track professors earn less in monetary compensation compared to tenure-track and tenured professors at the College.

19.     Additionally, tenure-track and tenured status provides a professor with a more meaningful role at the College as well as impact on decisions that TC makes, from hiring faculty to advising doctoral students.

20.     Over the course of ten years, Dr. Sabic-El-Rayess has complained of discrimination to leaders at the highest echelons at the College, including to President Bailey, then-Provost Stephanie Rowley, Dr. William Baldwin (both when he served as Vice Provost and Interim Provost), then-Ombudsman Stephen Peverly, and Title IX Coordinator Janice Robinson.

21.     After repeatedly using internal channels to lodge complaints of discrimination, Dr. Sabic-El-Rayess notified TC on May 6, 2023 that she had retained counsel to pursue claims against the College.

22.     In a June 2023 letter to TC, Dr. Sabic-El-Rayess asserted discrimination claims against TC and ~~asked the College to install~~reiterated her ~~into~~desire to be awarded tenure. Dr. Sabic-El-Rayess subsequently requested to be elevated to a tenure-track position with an expedited path toward tenure consideration.

23.    In July 2023, she engaged in further protected activity by reiterating her discrimination complaints during an hours-long investigative interview with TC's outside investigators.

24.    And, in November 2023, she again engaged in protected activity by reiterating her discrimination claims against TC in an additional letter she sent to TC.

25.    TC retaliated against Dr. Sabic-El-Rayess for making discrimination complaints.

26.    As an example, after Dr. Sabic-El-Rayess raised discrimination complaints to then-Interim Provost William Baldwin in 2023, the College abruptly discontinued communicating with her regarding a contemplated regular wage increase, did not raise her regular wages, and went so far as to **reduce** her regular wages.[5]

27.    On January 9, 2024, fewer than two months after Dr. Sabic-El-Rayess complained yet again about discrimination, TC rejected Dr. Sabic-El-Rayess's request to be elevated to a tenure-track position with an expedited path toward tenure consideration.

28.    During a meeting on March 11, 2024, the College most recently conveyed that it was rejecting Dr. Sabic-El-Rayess's request for a promotion to tenure-track status.

29.    By rejecting Dr. Sabic-El-Rayess's request to be ~~installed~~elevated into a tenure-track position, TC has refused to remedy its past course of discriminatory conduct and engaged in yet another adverse action against Dr. Sabic-El-Rayess.

30.    TC's purported rationale for rejecting Dr. Sabic-El-Rayess's candidacy was that Dr. Sabic-El-Rayess did not have any peer-reviewed publications. **This is false.** Dr. Sabic-El-Rayess has ~~nineteen~~25 peer-reviewed publications (~~one~~five of which ~~is a~~are articles or book

---

[5] Dr. Sabic-El-Rayess's compensation has four components: (1) regular wages, (2) supplemental wages, (3) bonus or overage wages, and (4) reimbursements.

~~chapter~~chapters that ~~is~~are forthcoming or currently in press) and is the sole author on ~~eight~~nine of those publications.

31.     **TC is well-aware that Dr. Sabic-El-Rayess has numerous peer-reviewed publications.**

32.     Upon information and belief, TC has granted tenure-track and tenured status to individuals with fewer peer-reviewed publications than Dr. Sabic-El-Rayess has.

33.     TC's false rationale for denying Dr. Sabic-El-Rayess the opportunity to be considered for tenure-track status belies any notion that the College is rejecting her candidacy for any legitimate reason.~~–~~ Other than the plainly false rationale that she has no peer-reviewed publications, TC has never articulated any specific reason—whether based on any particular administrative policy, professional judgment, academic determination, or anything else—to justify rejecting Dr. Sabic-El-Rayess for tenure-track status.

34.     Additionally, TC's false rationale reveals that the College's most recent rejection of Dr. Sabic-El-Rayess's request for a tenure-track position—conveyed to Dr. Sabic-El-Rayess on March 11, 2024—was both discriminatory and retaliatory.

35.     Shortly after Dr. Sabic-El-Rayess initiated this lawsuit, TC discriminated and retaliated against her again by rescinding an invitation it had previously extended to Dr. Sabic-El-Rayess to deliver the opening remarks at the Global Peace & Education Symposium that the College was organizing.

36.     On May 31, 2024, Dr. Sabic-El-Rayess learned that TC had additionally retaliated against her by failing to promptly request reimbursement of approximately $170,000 in connection with a grant she received from the U.S. Department of Homeland Security ("DHS"). ~~ ~~Specifically, the College did not request reimbursement of these funds by the deadline. ~~ ~~Until Dr. Sabic-El-

Rayess initiated the instant discrimination and retaliation lawsuit against TC—which was less than two weeks before the reimbursement request deadline elapsed,—TC had never failed to promptly request reimbursement on one of Dr. Sabic-El-Rayess's grants in this manner.grant.

37.    In the fall of 2024, after Dr. Sabic-El-Rayess learned that TC failed to properly request reimbursement on another one of her DHS grants, the College retaliated again by (a) suggesting to Dr. Sabic-El-Rayess that she hire a financial manager to handle grant-related tasks that TC had agreed to handle prior to the filing of this lawsuit and (b) withholding overage pay that Dr. Sabic-El-Rayess earned.

## II.    PARTIES, JURISDICTION, AND VENUE

37.38.  **PLAINTIFF DR. AMRA SABIC-EL-RAYESS** is a 4849-year-old Muslim woman who is currently employed by TC.

38.39.  **DEFENDANT TEACHERS COLLEGE, COLUMBIA UNIVERSITY** is the graduate school of education, health, and psychology at Columbia University, a private research university in Manhattan, New York, New York. . At all relevant times, TC was Plaintiff's employer within the meaning of all applicable federal, state, and local statutes and regulations. TC is headquartered in New YorkManhattan, New York and its only campus is located in Manhattan, New York, New York.. Upon information and belief, TC has over 500 employees.

39.40.  This Court has subject-matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action involves claims brought under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967. This Court has supplemental jurisdiction over Plaintiff's claims under the New York City Human Rights Law pursuant to 28 U.S.C. § 1367.

40.41.  Plaintiff timely filed a Charge of Discrimination and Retaliation with the United States Equal Employment Opportunity Commission ("EEOC") on January 31, 2024. –On February 5, 2024, the EEOC issued Dr. Sabic-El-Rayess notice of her Right to Sue.

41.42.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)–(2), because Defendant resides in the Southern District of New York, Defendant conducts substantial business in the Southern District of New York, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of New York.

### III.   TOLLING AGREEMENT AND NOTICE REQUIREMENT

42.43.  TC and Dr. Sabic-El-Rayess entered into a Tolling Agreement on September 12, 2023.

43.44.  The Tolling Agreement provided for the applicable statutes of limitations on Dr. Sabic-El-Rayess's claims against the College under federal, state, and local laws to be tolled from August 31, 2023 through one year following the execution of the Tolling Agreement (the "Tolling Period").

44.45.  In exchange for TC's promise to disregard any time that elapsed during the Tolling Period for purposes of asserting any time-based defenses, Dr. Sabic-El-Rayess promised not to file or serve a lawsuit against TC during the Tolling Period.

45.46.  Dr. Sabic-El-Rayess abided by this promise and did not file or serve a lawsuit against TC during the Tolling Period.

46.47.  In addition, the Tolling Agreement provided that either party could terminate the agreement "at any time by sending written notice (email sufficing) to the other party."

47.48.  Accordingly, on April 16, 2024, Dr. Sabic-El-Rayess terminated the Tolling Agreement.

48.49.  Following the filing of this ~~Second~~Third Amended Complaint, a copy of this ~~Second~~Third Amended Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code. *See* N.Y.C. Admin. Code § 8-502(c).

## IV.    FACTUAL ALLEGATIONS

### A.    Dr. Sabic-El-Rayess's Stellar Background and Performance at TC

49.50.  Dr. Sabic-El-Rayess holds a Masters of International Affairs from Columbia University's School of International and Public Affairs.

50.51.  She also has a ~~Masters~~Master of Philosophy and Ph.D.—both in Comparative and International Education—from TC.

51.52.  In recognition of Dr. Sabic-El-Rayess's academic prowess and accomplishments, Gita Steiner-Khamsi, the then-Chair of TC's International and Transcultural Studies ("ITS") Department, recruited Dr. Sabic-El-Rayess to join the College as a lecturer in the ITS Department in 2012.

52.53.  During her many years at TC, Dr. Sabic-El-Rayess has earned federal grants to perform innovative research on targeted violence prevention.

53.54.  These federal grants include a total budget of over $2.3 million that she has been awarded by DHS's Center for Prevention Programs and Partnerships in support of her work on preventing targeted violence and instilling resilience to hate in educators, students, and other key stakeholders.

54.55.  In 2022, Dr. Sabic-El-Rayess earned an $8.5 million research grant from a prominent Muslim NGO to establish a research laboratory that conducts innovative research to promote interfaith, interracial, and interethnic dialogues across global geographies ("the Lab").

55.56.  As the Lab's Principal Investigator and Executive Director, she envisions, develops, and leads multiple research projects.

56.57.  The research funding Dr. Sabic-El-Rayess earned has significantly expanded TC's research capacity, available graduate research assistantships ("GRAs") for students, and connections with grant-making institutions domestically and globally.

57.58.  Critically, Dr. Sabic-El-Rayess's professional accomplishments surpass those of her peers—including faculty who have secured tenured and tenure-track positions during her time at TC.  For instance, Dr. Sabic-El-Rayess:

a)      holds multiple positions, roles, and/or affiliations at the College and/or Columbia University (for example, she serves as the Faculty Advisor for TC's Muslim Students Association);

b)      has envisioned, developed, redesigned, and/or taught over twenty for-credit and non-credit courses across multiple departments within TC;

c)      has published nineteen25 peer-reviewed articles and book chapters (onefive of which isare in press or forthcoming), has published fifteen essays, serves as a co-editor of twothree upcoming special issues in academic journals on educational displacement and targeted violence prevention, and is regularly cited in leading publications and journals earning an h-index of thirteen and i10-index of thirteen, which is generally commensurate with the expectations for a tenured faculty member;[6]

---

[6]  *What Is a Good H-Index Required for an Academic Position?*, Technium, https://techniumscience.com/index.php/technium/hindex (last visited June 26, 2024Jan. 27, 2025) ("h-index scores between 3 and 5 feel common for new adjunct professors, scores between 8 and 12 fairly standard for . . . tenured associate professor, and scores between 15 and 20 about right for [] a full professor.").

d)      has published six different editions of a critically acclaimed book, including co-editing and publishing its translation in Bosnian, and recently published another ~~three~~four editions of another highly acclaimed book, including co-editing and publishing its upcoming translation in Bosnian;

e)      has received numerous literary, education, and academic awards, recognitions, and nominations for her books and contributions to education from national- and state-level reading and/or library associations, libraries, higher education institutions, and other education organizations, including (but not limited to) a 2021 Excellence in Nonfiction for Young Adults Award Finalist Medal from the Young Adult Library Services Association, a 2021 Best Children's Book of the Year Award from Bank Street College of Education, a Best Book of 2024 in Nonfiction Category by School Library Journal, recognition as a Finalist for a 2020 Children's and Young Adult Book Lovers' Literary Award for High School Nonfiction, and the Junior Library Guild Gold Standard Selection both in 2020 and 2024;

f)      has prepared several policy briefs and/or technical reports;

g)      has participated in ~~approximately dozens of~~over 60 conferences and delivered ~~over one hundred~~approximately 150 keynotes, lectures, and professional training workshops;

h)      has secured approximately $11 million in grant money—representing more than 93 times Dr. Sabic-El-Rayess's ~~current~~2023–2024 annual regular wages and over one fifth of the College's research funding for Fiscal Year 2022—approximately $6.7 million of which was awarded to support GRAs

for students and staff positions at TC and is projected to fund over 130 GRAs and over twenty full-time and part-time staff positions during the time periods covered by these grants;

i)  has won over ~~60~~70 grants, recognitions, and/or awards;

j)  has had her work referenced by media outlets, including TC's external affairs office, over ~~60~~80 times;

k)  has participated in over ~~70~~80 media interviews;

l)  was nominated to serve on TC's Faculty Advisory Committee, an elected committee that works with the Provost and President on addressing important issues within the College;

m)  has been repeatedly praised by TC leadership, including by President Bailey, as a leading scholar on innovative and critical research; and

n)  regularly receives glowing evaluations from students and teaches courses that are often at full or nearly-full student capacity.

~~58.~~59.  **Few tenure-track professors at the College can boast such a robust constellation of accomplishments.**

B.  <u>TC Repeatedly Denied Dr. Sabic-El-Rayess Tenure-Track Positions Because She Is Muslim</u>

~~59.~~60.  At TC, there are two methods by which a tenure-track and/or tenured professor is hired: Permission to Recruit ("PTR") and Target of Opportunity ("TOO").

~~60.~~61.  The PTR process is supposedly open to all applicants, while TOO is a process through which the College seeks to hire a specific individual exclusively.

~~61.~~62.  Dr. Sabic-El-Rayess has repeatedly sought tenure-track positions at TC through both the PTR and TOO routes, but the College has consistently rejected her candidacy.

62.63.  In fact, TC leadership has gone so far as to dissuade her from seeking such positions.

63.64.  Dr. Sabic-El-Rayess has formally applied for or otherwise sought tenure-track positions at TC numerous times.

64.65.  She formally applied for tenure-track positions through the PTR route twice (in the fall of 2012 and fall of 2013), but TC rejected her candidacy in both instances.

65.66.  She also continuously pursued tenure-track positions through the TOO route until as recently as 2024, but TC rejected her attempts to be promoted via that route as well.

66.67.  From the outset of her decade-plus quest for tenure-track status, crucial decisionmakers have made clear that Dr. Sabic-El-Rayess's Muslim identity functioned as a glass ceiling that barred her from ever ascending to TC's tenure-track or tenured ranks.

67.68.  For example, in December of 2012, Dr. Sabic-El-Rayess learned from a colleague that a member of TC's Hiring Committee (Professor Aaron Pallas) had been probing into her Muslim background and asked whether she was an observant Muslim.

68.69.  In response, Dr. Sabic-El-Rayess confirmed that she was in fact Muslim.

69.70.  After she did so, the College swiftly rejected her for the PTR position and awarded the role to Oren Pizmony-Levy, a non-Muslim candidate.

70.71.  Once hired, Professor Pizmony-Levy displayed clear deficiencies as an educator.

71.72.  Upon information and belief, he received poor reviews from TC students and at least one graduate student left his class out of frustration with his subpar teaching.

72.73.  Professor Pizmony-Levy even sought guidance from Dr. Sabic-El-Rayess on how to improve his teaching and research skills—a testament to her superior performance as an educator.

73.74.  In contrast to Professor Pizmony-Levy's negative standing with his students, Dr. Sabic-El-Rayess was so well-revered that, in anticipation of her departure from the ITS Department in 2014, students organized a petition to demand that she remain on the ITS Department Faculty.

74.75.  In 2013, Dr. Sabic-El-Rayess applied for another PTR position and was once again rejected.

75.76.  Even before Dr. Sabic-El-Rayess applied, ITS Department Chair Steiner-Khamsi conveyed that the decks were stacked against her and that applying for the position would be futile.

76.77.  Professor Steiner-Khamsi was right: yet again, TC awarded the role to a non-Muslim candidate named Noah Drezner.

77.78.  Shortly thereafter, in or around January 2014, Dr. Sabic-El-Rayess met with ITS Department Chair Steiner-Khamsi and sought guidance on how she could improve her chances of securing a tenure-track position in the future.

78.79.  In response, Professor Steiner-Khamsi conveyed that Dr. Sabic-El-Rayess's Muslim background doomed her chances of ever obtaining tenure.

79.80.  Remarkably, ITS Department Chair Steiner-Khamsi acknowledged that Dr. Sabic-El-Rayess was more than qualified for a tenure-track position but stressed that she would never receive sufficient support for tenure at TC because of her Muslim identity.

80.81.  Professor Steiner-Khamsi's prediction has come to fruition.

81.82.  A decade later, Dr. Sabic-El-Rayess continues to stagnate in a non-tenure-track position despite her exceptional accomplishments and her repeated applications for tenure-track positions.

82.83.  During Dr. Sabic-El-Rayess's employment at the College, TC has promoted at least one non-Muslim non-tenure-track Associate Professor of Practice into a tenure-track Associate Professor position.

83.84.  During Dr. Sabic-El-Rayess's employment at the College, TC has maintained a practice of creating PTR positions for specific, non-Muslim professors, even while advertising such positions as open to all applicants.

84.85.  In 2021, for example, the College promoted Professor Mary Mendenhall, a non-Muslim Associate Professor of Practice, into a tenure-track PTR position in TC's ITS Department.

85.86.  Immediately before her promotion via the PTR route, Professor Mendenhall was in a non-tenure-track position at TC, like Dr. Sabic-El-Rayess.

86.87.  Upon information and belief, Dr. William Baldwin served on the Search Committee for the PTR position in the ITS Department.

87.88.  During a January 2021 meeting, Dr. Baldwin admitted to Dr. Sabic-El-Rayess that the PTR position in the ITS Department was created specifically for Professor Mendenhall, even though the position appeared to be open to all applicants.

88.89.  In contrast, TC has never created a PTR position specifically for Dr. Sabic-El-Rayess.

89.90.  At the time of her promotion, Professor Mendenhall had a similar number of publications as Dr. Sabic-El-Rayess.

90.91.  At the time of her promotion, Professor Mendenhall had similar, if not fewer, relevant qualifications compared to Dr. Sabic-El-Rayess.

91.92.  The only significant difference between Dr. Sabic-El-Rayess and Professor Mendenhall was that Professor  Mendenhall is not Muslim, and, therefore, was not held

back from being promoted from a non-tenure-track Associate Professor of Practice role into a tenure-track Associate Professor position at TC.

92.93.  Professor Mendenhall is not the only non-Muslim individual whom TC has promoted from a non-tenure-track role into a tenure-track and/or tenured role.

93.94.  For instance, in or around 2021, TC promoted Professor Pamela Ann Koch, a non-Muslim, into a tenure-track and/or tenured position from a non-tenure-track role.

C.    TC Dissuaded Dr. Sabic-El-Rayess from Applying for Tenure-Track Positions Due to Her Age

94.95.  In 2021, Dr. Sabic-El-Rayess expressed interest in a PTR position within TC's Adult Learning & Leadership ("ALL") Program in the College's Organization and Leadership ("O&L") Department.

95.96.  Specifically, in or around January of 2021, Dr. Sabic-El-Rayess told Professor Victoria Marsick, the Director of TC's ALL Program, that she was interested in a PTR in the ALL Program.

96.97.  In response, Professor Marsick appeared receptive to the possibility of Dr. Sabic-El-Rayess achieving tenure-track status through a PTR position in the ALL Program.

97.98.  Subsequently, Dr. Sabic-El-Rayess even assisted Professor Marsick, who was going to be the Head of the Search Committee, with drafting the PTR documents, including the description of the role.

98.99.  In the fall of 2022, Dr. Sabic-El-Rayess exchanged multiple emails with Professor Thomas James and Professor Marsick about the possibility of being promoted to tenure-track status through a PTR position in the ALL Program.

99.100.      In these emails, Dr. Sabic-El-Rayess asked Professor James for a recommendation and asked Professor Marsick for support in applying for the PTR role.

100.101.      In fact, Dr. Sabic-El-Rayess had transferred into the O&L Department in January of 2022 based on assurances from Professor Marsick that there would be a tenure-track opportunity available to her there.

101.102.      But Professor Marsick subsequently reversed course and signaled to Dr. Sabic-El-Rayess that any application from her would be futile due to her age.

102.103.      Specifically, in September 2022, during a conversation about Dr. Sabic-El-Rayess's upcoming bid for the PTR position, Professor Marsick told Dr. Sabic-El-Rayess, "**you are not a spring chicken**," and indicated that she (Professor Marsick) instead preferred to hire someone "**young**" who had "**youth**" and "**energy**."

103.104.      Shortly thereafter, Dr. Sabic-El-Rayess told Dr. Pierre Faller—a Lecturer in the ALL Program and a member of the Search Committee for the PTR position—that Professor Marsick had made this ageist remark.

104.105.      During Dr. Sabic-El-Rayess's conversations with Dr. Faller regarding the PTR in the O&L Department's ALL Program, Dr. Faller confirmed to Dr. Sabic-El-Rayess that Professor Marsick's ideal candidate for the position was an individual younger than Dr. Sabic-El-Rayess.

105.106.      Based on the ageist remark from Professor Marsick and Professor Steiner-Khamsi's earlier comments exposing anti-Muslim bias in the tenure process, Dr. Sabic-El-Rayess reasonably concluded that applying for this PTR position would be futile.

106.107.      This PTR was ultimately offered to Dr. Rajashi Ghosh, a non-Muslim candidate.

107.108.    Upon information and belief, Dr. Rajashi Ghosh is younger than Dr. Sabic-El-Rayess.

D.    Anti-Muslim Bias Pervades TC

108.109.    Dr. Sabic-El-Rayess's ongoing exclusion from tenure-track positions is part and parcel of the systematic discrimination that TC has wielded against Muslim faculty, employees, and students.

109.110.    The sheer absence of Muslims from tenure-track and tenured positions at TC—the oldest and largest graduate school of education in the United States—speaks volumes.

110.111.    **Upon information and belief, no Muslim academic has ever received a tenure-track or tenured position at TC, despite the College receiving applications from many qualified Muslim applicants.**

111.112.    Indeed, in or around July of 2023, TC hired a non-Muslim woman named KerryAnn O'Meara to fill its provost position, despite the fact thateven though a more qualified Muslim candidate—a man named Dr. Fouad Abd-El-Khalick who currently serves as the DeanProvost of the University of North Carolina at Chapel Hill's School of EducationMassachusetts Amherst—applied for the position.

112.113.    Upon information and belief, the President's Chief of Staff Catherine Embree openly expressed that TC leadership had reservations about extending an offer to Dr. Abd-El-Khalick, purportedly because he was "too strong" of an applicant.

113.114.    Beyond this, the College's leadership has repeatedly castigated Muslims as would-be terrorists, criminals, and suspects.

18

114.115.     For instance, as Dr. Sabic-El-Rayess was preparing to meet with a prominent Muslim NGO in 2021 to seek an $8.5 million grant (which she was later awarded), TC subjected her and the NGO to Islamophobic treatment.

115.116.     TC's then-Vice President for Development and External Affairs Kelly Moody claimed that the College had identified "a few flags" with the prominent Muslim NGO in the course of TC's research and needed to confirm that the NGO was not engaged in any "criminal activity at the time of donation."

116.117.     Upon information and belief, the College has not subjected non-Muslim institutions to comparable levels of scrutiny.

117.118.     Such demonization of Muslim-affiliated organizations is consistent with a larger pattern of Islamophobia at the College.

118.119.     Upon information and belief, former TC President Susan Fuhrman remarked that, while she approved of TC accepting funds from Muslim organizations, she did not want to have her pictures taken with "**them**."

119.120.     Similarly, Professor Pallas—the same individual who inappropriately inquired about Dr. Sabic-El-Rayess's Muslim identity when he served on the PTR hiring committee—also displayed his Islamophobia over Twitter while he was serving as the Chair of Dr. Sabic-El-Rayess's then-Department.[7]

120.121.     In or around May of 2020, he mocked traditional Muslim attire by likening the virtual caps that Columbia University was superimposing onto the heads of graduates during a virtual ceremony to a fez, a hat associated with religious adherence to Islam.

---

[7] Though Twitter has since been renamed "X," this Complaint refers to the social media platform as Twitter because that was the platform's name during the relevant events described herein.

121.122.　　　Specifically, he tweeted: "That is one sad-looking filter. ~~Dangerously~~ **Dangerously** close to a fez."

122.123.　　　After Dr. Sabic-El-Rayess repeatedly complained about anti-Muslim animus, including by notifying TC leadership of Professor Pallas's Islamophobic tweet and his earlier misconduct, Professor Pallas deactivated his Twitter account—presumably in an effort to extinguish the evidence of his Islamophobic remarks.

123.124.　　　TC's leadership has also disparaged academic pursuits involving the study of Islam, including Dr. Sabic-El-Rayess's own coursework.

124.125.　　　For example, in October of 2018, TC's Faculty Executive Subcommittee scrutinized Dr. Sabic-El-Rayess's application to teach a course titled "Education, Islam and Radicalization" and questioned the "relevance and importance" of the course material, even though Dr. Sabic-El-Rayess had submitted a comprehensive application with detailed explanations justifying the need for such a course.

125.126.　　　Upon information and belief, the Faculty Executive Subcommittee had never questioned the "relevance and importance" of courses Dr. Sabic-El-Rayess proposed that were unrelated to the study of Islam.

126.127.　　　Such questioning of Dr. Sabic-El-Rayess's course was obviously unwarranted—to the point that two faculty members reached out to her to comment on the inappropriate communication.

127.128.　　　Scrutiny of Dr. Sabic-El-Rayess's Islam-related coursework has persisted.

128.129.　　　For example, in September 2021, she learned that multiple TC professors had attempted to dissuade Maryam Sharrieff, a Muslim student who wears a hijab, from taking one of Dr. Sabic-El-Rayess's courses.

129.130.        These professors denigrated the course and Dr. Sabic-El-Rayess, with one (Senior Lecturer and Anthropology Program Director Grey Gundaker) remarking to the student: "Oh it's probably one of those courses that just says Islam is great and Muslims are not terrorists. You probably know more than the professor!"

130.131.        More broadly, since the commencement of this action, the U.S. Department of Education's Office of Civil Rights has announced an investigation into Columbia University based on allegations of discriminatory treatment against Muslims there.[8]

E.    Dr. Sabic-El-Rayess Repeatedly Complained About Anti-Muslim Bias; TC Did Not Take Remedial Action and Instead Continued to Block Her Career Trajectory

131.132.        Throughout her many years at the College, Dr. Sabic-El-Rayess repeatedly complained about the anti-Muslim discrimination that she has faced.

132.133.        But TC never responded effectively.

133.134.        On February 27, 2014, Dr. Sabic-El-Rayess complained to Professor Pizmony-Levy about her experiences of anti-Muslim discrimination and reported Professor Steiner-Khamsi's remark that Dr. Sabic-El-Rayess would never be promoted to a tenured position due to her Muslim religion.

134.135.        On September 30, 2014, Dr. Sabic-El-Rayess met with then-Vice Provost Baldwin and notified him that she had been questioned about her Muslim background in connection with the PTR hiring process.

---

[8] *See* Amanda Yen, *Feds Probe Alleged Anti-Palestinian Racism at Columbia, Group Says*, The Daily Beast (May 3, 2024, 6:54 PM EDT), https://www.thedailybeast.com/education-department-officially-investigates-alleged-anti-palestinian-racism-at-columbia-university.

135.136.    During this meeting, Dr. Sabic-El-Rayess also complained to Vice Provost Baldwin that Professor Steiner-Khamsi conveyed that Dr. Sabic-El-Rayess's Muslim identity would be an obstacle to her receiving a tenured position at the College.

136.137.    After Dr. Sabic-El-Rayess reported the discrimination, Vice Provost Baldwin became disengaged and abruptly ended the meeting.

137.138.    On October 8, 2018, Dr. Sabic-El-Rayess emailed TC Ombudsman Stephen Peverly and reported that Professor Steiner-Khamsi had conveyed "that [Dr. Sabic-El-Rayess's] Muslim background was a problem."

138.139.    In or around the fall of 2020, Dr. Sabic-El-Rayess reached out to then-Provost Stephanie Rowley and reiterated her interest in obtaining tenure.

139.140.    In response, TC continued to reject her for TOO opportunities by, among other things, deflecting, delaying, and misleading Dr. Sabic-El-Rayess.

140.141.    Specifically, Provost Rowley directed her to speak with Professor Pallas, who was the Chair of the EPSA (Education Policy and Social Analysis) Department in which Dr. Sabic-El-Rayess was based at the time.

141.142.    After Provost Rowley conveyed that Dr. Sabic-El-Rayess's chances of obtaining tenure hinged on Professor Pallas's support, Dr. Sabic-El-Rayess met with Provost Rowley in or around December 2020 and complained about Professor Pallas's Islamophobic conduct, including his discriminatory tweet ("That is one sad looking filter. Dangerously close to a fez").

142.143.    On September 12, 2021, Dr. Sabic-El-Rayess emailed President Bailey and Provost Rowley and complained of pervasive anti-Muslim bias at the College.

143.144.    Just a few months later—on or around January 14, 2022—Dr. Sabic-El-Rayess met with Provost Rowley, O&L Department Chair Mark Gooden, ALL Program Director Victoria Marsick, and Vice Dean for Research Carol Hammer to discuss the possibility of securing tenure-track status through a TOO opportunity in the O&L Department.

144.145.    During the January 2022 meeting, O&L Department Chair Gooden asked Provost Rowley for her support in promoting Dr. Sabic-El-Rayess via the TOO route, and he stressed that he supported such a hire.

145.146.    However, Provost Rowley conveyed that she would not approve such a promotion via the TOO route, thus quashing Dr. Sabic-El-Rayess's TOO process altogether.

146.147.    Provost Rowley supplied no rationale for her decision.

147.148.    In or around October of 2022, Dr. Sabic-El-Rayess met with President Bailey.

148.149.    During this meeting, Dr. Sabic-El-Rayess reiterated that she had endured anti-Muslim discrimination at TC and explained that her only chance of receiving a tenure-track position would be through the TOO route.

149.150.    During that meeting, President Bailey agreed with Dr. Sabic-El-Rayess that she was highly qualified, concurred that she should receive a tenure-track position, and asked whether she believed the anti-Muslim discrimination that she had experienced was institutional in nature.

150.151.    Dr. Sabic-El-Rayess responded to President Bailey's question in the affirmative.

151.152.    With respect to any potential TOO pathway to tenure, President Bailey stated: "Let me talk to my people."

152.153.      During the meeting, Dr. Sabic-El-Rayess alerted President Bailey to the absence of Muslims in TC leadership and flagged that TC, in its history, has never had a tenured faculty member who is Muslim.

153.154.      President Bailey did not dispute that TC has never had a Muslim tenured faculty member.

154.155.      In or around February 2023, President Bailey reached out to Dr. Sabic-El-Rayess about increasing her annual regular wages by nearly $30,000 and conveyed that the increase would be instituted retroactively as of September 2022.

155.156.      President Bailey advised her to speak with then-Interim Provost Baldwin about the regular wage increase.[9]

156.157.      On or around February 22, 2023, Dr. Sabic-El-Rayess met with Interim Provost Baldwin to discuss the regular wage increase.

157.158.      During that same meeting, Dr. Sabic-El-Rayess expressed interest in securing a tenure-track position through the TOO route.

158.159.      In response, Interim Provost Baldwin agreed with Dr. Sabic-El-Rayess that her accomplishments and background presented a compelling case for tenure-track status at the College; yet he nevertheless tried to pressure her into remaining in a non-tenure-track position.

159.160.      When Dr. Sabic-El-Rayess brought up the anti-Muslim discrimination that she experienced at TC, Interim Provost Baldwin balked at continuing the conversation.

160.161.      He told her that she should not tell him the names of the individuals who discriminated against her because then he would be obligated to report and investigate the discrimination with the assistance of Human Resources.

---

[9] By this time, William Baldwin's role had switched from Vice Provost to Interim Provost.

161.162.    In response, Dr. Sabic-El-Rayess told Interim Provost Baldwin that she **wanted** him to investigate her complaints and indicated her openness to meet with Human Resources; she also elaborated on the anti-Muslim discrimination that she had faced at TC.

162.163.    She reminded him that she had already reported discrimination to him back in September of 2014 when she told him about Professor Steiner-Khamsi's remark that Dr. Sabic-El-Rayess would never receive tenure because she is Muslim and Professor Pallas's inappropriate inquiry into her Muslim background during the hiring process for a PTR position.

163.164.    On February 24, 2023, Dr. Sabic-El-Rayess emailed Interim Provost Baldwin and reiterated that she had repeatedly faced barriers to promotion at TC due to her Muslim religion.

164.165.    On March 31, 2023, Interim Provost Baldwin responded by stating that he had been "wrestling" with how to respond to her complaints of discrimination.

165.166.    On April 5, 2023, Dr. Sabic-El-Rayess emailed Interim Provost Baldwin yet again to complain of anti-Muslim discrimination in the College's tenure-track selection process and to reiterate her interest in securing a tenure-track position through the TOO route.

166.167.    On April 17, 2023, Dr. Sabic-El-Rayess emailed TC's Title IX Coordinator Janice Robinson and complained of anti-Muslim discrimination.

167.168.    In the email, Dr. Sabic-El-Rayess asked how she would be protected against retaliation for her complaints of discrimination.

168.169.    Ms. Robinson responded by referring Dr. Sabic-El-Rayess to TC's retaliation policy.

169.170.    Notwithstanding Dr. Sabic-El-Rayess's persistent complaints of discrimination to leadership at the upper echelons of the College, TC has not taken any remedial

action to curb its pattern of anti-Muslim discrimination and instead has continued to subject Dr. Sabic-El-Rayess to discriminatory and retaliatory conduct.

170.171.    Interim Provost Baldwin's last correspondence with Dr. Sabic-El-Rayess about the TOO was in late March 2023—over a year ago.

171.172.    In an April 2023 email to Interim Provost Baldwin, Dr. Sabic-El-Rayess reiterated her concerns about anti-Muslim discrimination at TC.

172.173.    After she sent that email, Interim Provost Baldwin ceased communicating with Dr. Sabic-El-Rayess about the TOO opportunity altogether.

173.174.    After Dr. Sabic-El-Rayess raised complaints of discrimination to Interim Provost Baldwin, TC has also halted all conversations with her about a regular wage increase.

174.175.    Although President Bailey reached out to Dr. Sabic-El-Rayess over a year ago about increasing her regular wages retroactively as of September 2022, the College never implemented this increase.

175.176.    Beyond this, the College **reduced** Dr. Sabic-El-Rayess's regular wages in 2023 relative to what Dr. Sabic-El-Rayess received in 2022.

176.177.    In early April 2024, Dr. Sabic-El-Rayess reached out to Katie Davis, Program Manager of the Lab, in order to obtain a list of all payments, overages, and reimbursements that TC has made to her.

177.178.    In response, Ms. Davis sent Dr. Sabic-El-Rayess pay data confirming that TC reduced Dr. Sabic-El-Rayess's regular wages by nearly $10,000 from 2022 to 2023.

178.179.    On multiple occasions, Dr. Sabic-El-Rayess reached out to TC to ask why the College had decreased her regular wages, but TC never provided an answer.

F.    Dr. Sabic-El-Rayess Complained of Discrimination and Again Sought Tenure; TC Rejected Her Based on a Plainly False Rationale

179.180.     On June 21, 2023, Dr. Sabic-El-Rayess sent TC a letter detailing her discrimination claims against the College.

180.181.     In that letter, Dr. Sabic-El-Rayess asserted that TC discriminated against her based on both her religion (~~Muslim~~Islam) and age. Further, Dr. Sabic-El-Rayess asserted that TC's conduct exposed the College to liability for violations of the New York City Human Rights Law, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967, among other statutes.

181.182.     On July 10, 2023, Dr. Sabic-El-Rayess attended an in-person investigative interview with TC's outside investigators.

182.183.     During the hours-long interview, Dr. Sabic-El-Rayess reiterated the discrimination that she had experienced at the College.

183.184.     On or around November 7, 2023, Professor Marsick emailed Dr. Sabic-El-Rayess, on behalf of TC, to request (a) that Dr. Sabic-El-Rayess apply to be reappointed into a non-tenure-track role as an Associate Professor of Practice and (b) that Dr. Sabic-El-Rayess assemble a dossier as part of the application for reappointment into a non-tenure-track role.

184.185.     Before Dr. Sabic-El-Rayess complained of discrimination, the College had never requested or required Dr. Sabic-El-Rayess to compile a dossier in order to remain in her non-tenure-track role.

185.186.     On November 21, 2023, Dr. Sabic-El-Rayess sent TC a letter in which she objected to TC's proposed reappointment process.

186.187.     Among other things, the letter reiterated her complaint that she had "been relegated in the past" to a non-tenure-track Professor of Practice position "due to discrimination";

in the letter, she also complained about TC's proposal to include at least two faculty members in the reappointment process who had been the subject of her discrimination complaints.

~~187.~~188.          On January 9, 2024, TC retaliated.

~~188.~~189.          That day, TC told Dr. Sabic-El-Rayess that it would not agree to place her on any sort of expedited path toward tenure consideration.

~~189.~~190.          During the January 9, 2024 meeting, TC explained that all it was prepared to offer Dr. Sabic-El-Rayess was a five-year-long reappointment into a non-tenure-track Associate Professor of Practice position.

~~190.~~191.          The College's purported rationale for this adverse action was that Dr. Sabic-El-Rayess does not have any peer-reviewed publications. **This rationale is false.**

~~191.~~192.          In fact, Dr. Sabic-El-Rayess has ~~nineteen~~25 peer reviewed publications, including ~~one publication~~five publications that ~~is~~are forthcoming or currently in press.

~~192.~~193.          For ~~eight~~nine of these publications, she is identified as the sole author.

~~193.~~194.          **TC is well-aware that Dr. Sabic-El-Rayess has authored numerous peer-reviewed publications.**

~~194.~~195.          On or around June 28, 2019, Dr. Sabic-El-Rayess shared a copy of her curriculum vitae with President Bailey and then-Provost Rowley.

~~195.~~196.          On or around October 17, 2022, Dr. Sabic-El-Rayess again shared a copy of her curriculum vitae with President Bailey.

~~196.~~197.          In the June 21, 2023 correspondence that Dr. Sabic-El-Rayess sent TC, a copy of her curriculum vitae was attached.

197.198.        In all three of the aforementioned communications, the curriculum vitae that Dr. Sabic-El-Rayess shared explicitly identified all the peer-reviewed publications that she had at that time.

198.199.        During a professional event on or around March 7, 2024, William Dodge Rueckert (Chair Emeritus of TC's Governing Board) stated that Dr. Sabic-El-Rayess "is a **prolific publisher** and has earned acclaim from no less than President Joe Biden for her work" and described her curriculum vitae as containing "publication pages [that] are I think a total of 35, maybe 40 pages, probably growing by [the] minute."

199.200.        Further, TC has granted tenure-track and/or tenured status to non-Muslim individuals who, at the time of their appointments, had fewer peer-reviewed publications than Dr. Sabic-El-Rayess has.

200.201.        Upon information and belief, these non-Muslim individuals include, but are not limited to, Ansley Erickson, Jordan Matsudaira, Oren Pizmony-Levy, and Nicholas Limerick.

201.202.        Upon information and belief, tenure at TC typically only requires an applicant to have around five or six peer-reviewed publications—a threshold that Dr. Sabic-El-Rayess surpassed years ago.

202.203.        After TC communicated this false rationale for blocking Dr. Sabic-El-Rayess's promotion, Dr. Sabic-El-Rayess reminded the College via email that she hashad, in fact, at the time authored numerous peer-reviewed publications and that, for eight of these publications, she iswas identified as the sole author.

203.204.        TC never responded to this email.

204.205.        Other than the plainly false rationale that she has no peer-reviewed publications, TC has never articulated any specific reason—whether based on any particular

administrative policy, professional judgment, academic determination, or anything else—to justify rejecting Dr. Sabic-El-Rayess's efforts to be promoted to tenure track via both the PTR and TOO routes.

205.206.    TC's false rationale underscores that TC rejected Dr. Sabic-El-Rayess's request for an expedited path to tenure consideration for non-academic and illegal reasons, namely because of her Muslim religion, her age, and her persistent complaints of discrimination.

206.207.    TC's efforts to shunt Dr. Sabic-El-Rayess into a five-year-long reappointment as a non-tenure-track Associate Professor of Practice confirm that (a) the College has rejected Dr. Sabic-El-Rayess's attempts to be placed into tenure-track status and (b) the College has no intention of promoting Dr. Sabic-El-Rayess in the future.

207.208.    On March 11, 2024, the College most recently conveyed its rejection of Dr. Sabic-El-Rayess during a meeting between Dr. Sabic-El-Rayess and TC Provost KerryAnn O'Meara.

208.209.    During the meeting, in response to direct questioning on the issue, Provost O'Meara stated that the College was not offering tenure-track or tenured status to Dr. Sabic-El-Rayess.

G.    TC Invited Dr. Sabic-El-Rayess to Participate in a Symposium, But Swiftly Revoked the Invitation and Excluded Her Entirely After She Filed a Discrimination and Retaliation Lawsuit

209.210.    On Tuesday, April 16, 2024, Jazmin Guardado (TC's International Projects & Partnerships Manager) invited Dr. Sabic-El-Rayess to deliver the opening remarks at the Global Peace & Education Symposium that the College was organizing in partnership with the United Nations University for Peace. The event was scheduled to be held on Thursday, April 25, 2024.

210.211.     The Symposium would have served as a useful professional and networking opportunity for Dr. Sabic-El-Rayess, whose core work focuses on advancing peaceful co-existence by preventing hate-fueled violence.

211.212.     Later on Tuesday, April 16, 2024, Dr. Sabic-El-Rayess sent an email response to Ms. Guardado accepting the College's invitation to speak at the Symposium.

212.213.     On Wednesday, April 17, 2024, Dr. Sabic-El-Rayess engaged in protected activity by initiating the instant discrimination and retaliation lawsuit against TC.

213.214.     TC became aware of Dr. Sabic-El-Rayess's discrimination and retaliation lawsuit shortly after she initiated it. On Friday, April 19, 2024, two attorneys representing the College filed notices of appearance in this case and, on Monday, April 22, 2024, TC returned a form to Dr. Sabic-El-Rayess waiving the service of summons in the lawsuit. *See Sabic-El-Rayess v. Teachers Coll., Columbia Univ.*, No. 1:24-cv-02891-JMF, ~~Dkts~~ECF Nos. 7, 9, 11 (S.D.N.Y.).

214.215.     Just one week after Dr. Sabic-El-Rayess initiated this discrimination and retaliation action against TC, the College again discriminated and retaliated against her by rescinding its invitation to Dr. Sabic-El-Rayess to deliver opening remarks at the Symposium.

215.216.     Specifically, on Wednesday, April 24, 2024—just one day before the Symposium was scheduled to take place—Ms. Guardado emailed Dr. Sabic-El-Rayess to tell her that Dr. Sabic-El-Rayess was no longer invited to deliver the opening remarks.

216.217.     TC's rationale for revoking the invitation was discriminatory and drew upon invidious stereotypes of Muslims as dangerous.

217.218.     Specifically, Ms. Guardado wrote that Dr. Sabic-El-Rayess was disinvited as a speaker at the Symposium because "our community has been in the spotlight in a more visible manner"; "peace and education [are] a more sensitive topic right now" and, as a result, Dr. Sabic-

El-Rayess's remarks could be "more susceptible to criticism" and her "words taken out of context." Further, Ms. Guardado claimed that the "nature of our event" had to be "change[d]" to "create **a safe** and more vocal space for all participants."

218.219.    The clear implication of this "safe[ty]" rationale was that, because Dr. Sabic-El-Rayess is Muslim and Columbia University has recently been under the microscope due to antisemitism allegations,[10] TC deemed Dr. Sabic-El-Rayess's participation in the Symposium to be a threat to TC and Columbia University.

219.220.    Based on a flyer that TC disseminated before the event, it appears that one or two other Muslim scholars were scheduled to participate in the Symposium—but only as panelists whose remarks could be controlled by a moderator.

220.221.    By contrast, TC had originally invited Dr. Sabic-El-Rayess to deliver approximately twenty minutes of unmoderated remarks as a standalone speaker.

221.222.    TC's proffered rationale for disinviting Dr. Sabic-El-Rayess reveals that: (a) the College effectively imposed a quota and decided that having more than one or two Muslim scholars at the Symposium would not be "safe"; and (b) the College concluded that Dr. Sabic-El-Rayess, the only Muslim speaker with a platform to deliver unmoderated remarks and a currently pending discrimination and retaliation lawsuit against TC, could somehow endanger the event.

222.223.    Not only did TC disinvite Dr. Sabic-El-Rayess from delivering opening remarks at the Symposium, but TC also did not invite her to participate in the Symposium as a panelist or even invite her to attend the event as an audience member. Instead, TC excluded her entirely.

---

[10] *See* Nicholas Fandos & Sharon Otterman, *Inside the Week that Shook Columbia University*, The New York Times (Apr. 23, 2024; updated May 7, 2024), https://www.nytimes.com/2024/04/23/nyregion/columbia-university-campus-protests.html.

223.224.       Dr. Sabic-El-Rayess was humiliated by this revocation of the invitation to speak at and complete exclusion from the Symposium. At the time TC revoked the invitation, notice of Dr. Sabic-El-Rayess's involvement in the Symposium had already been sent out to the entire TC community. Dr. Sabic-El-Rayess had already prepared her remarks and had made arrangements in her schedule to leave another professional event early so that she could participate in the Symposium. Beyond causing Dr. Sabic-El-Rayess humiliation, TC's discriminatory and retaliatory conduct blocked her from participating in a valuable networking and professional development opportunity.

H.    TC Retaliated Against Dr. Sabic-El-Rayess by Twice Failing to PromptlyProperly Request Reimbursement of Approximately $170,000 in Connection with Her GrantGrants

224.225.       On Friday, May 31, 2024, Dr. Sabic-El-Rayess learned that TC failed to request reimbursement of approximately $170,000 in her grant funds from DHS by the deadline.

225.226.       Specifically, Dr. Sabic-El-Rayess learned that TC had failed to promptly request reimbursement from DHS for costs incurred by her team on Grant #029, a grant she received with a period of performance that ended on December 31, 2023.

226.227.       DHS provides a 120-day grace period, after the last day of the grant's period of performance, for the recipient to request payment. So, the time period for TC to submit a request for reimbursement to cover Dr. Sabic-El-Rayess's team's costs expired on April 30, 2024.

227.228.       Until Dr. Sabic-El-Rayess initiated the instant discrimination and retaliation lawsuit against TC on April 17, 2024, TC had never failed to promptly request reimbursement in connection with one of her grantsGrant #029 in this manner. For instance, in October 2023, July 2023, June 2023, January 2023, November 2022, and July 2022, TC promptly submitted reimbursement requests in connection with Grant #029.Dr. Sabic-El-Rayess's DHS grant.

228.229.    On June 11, 2024, John Hernandez (TC's Director of Office of Grants & Contracts Accounting) remarked on the unprecedented nature of TC's failure to promptly request reimbursement in an email, stating: "[T]his is not the norm. In my 16 years at the College, we never had a draw down [reimbursement] issue and we never had a finding in our [s]ingle [a]udit."

229.230.    On a call with Dr. Sabic-El-Rayess that took place that same day, Mr. Hernandez reiterated that this type of error had never happened before, that Mr. Hernandez had been "kept in the dark" about the situation and only learned about it around the same time that Dr. Sabic-El-Rayess did, and that President Bailey and Provost O'Meara had been informed about the error.

230.231.    Regarding this most recentrequest for reimbursement on Dr. Sabic-El-Rayess's DHS grant that TC failed to promptly request, the date of expiration on the time period for TC to make the request—April 30, 2024—was less than two weeks after Dr. Sabic-El-Rayess initiated the instant discrimination and retaliation lawsuit against TC on April 17, 2024.

231.232.    Based on this temporal proximity and the unprecedented nature of this type of failure on TC's part, it appears that TC deliberately failed to request reimbursement before the deadline expired on April 30, 2024 in order to punish Dr. Sabic-El-Rayess for advancing discrimination and retaliation claims against the College in the instant lawsuit.

232.    This adverse action by TC has negatively impacted Dr. Sabic-El-Rayess's credibility and reputation with DHS, because she is the principal investigator and researcher on this grant.    In addition to creating a situation in which Dr. Sabic-El-Rayess's team would potentially not be properly reimbursed for all its important work, TC's failure to promptly request reimbursement for the funds could additionally prejudice the outcome of another grant application that Dr. Sabic-El-Rayess has submitted to DHS.

233.     Adding insult to injury, TC concealed the full monetary quantity of the error from Dr. Sabic-El-Rayess for weeks, which jeopardized Dr. Sabic-El-Rayess's ability to help promptly resolve the issue and worsened the negative impact of the error on Dr. Sabic-El-Rayess.

234.     TC's concealment of the extent of the error from Dr. Sabic-El-Rayess also appears to have been deliberate. John Wilder (Senior Grants Manager at DHS's Center for Prevention Programs and Partnerships) told Dr. Sabic-El-Rayess that he had never seen a situation like this one in which an institution failed to promptly assist in the rectification of an error of this magnitude and failed to promptly inform him of the error.

235.     In July 2024, Dr. Sabic-El-Rayess learned that TC failed to properly request reimbursement in connection with another one of her grants from DHS (Grant #137) in September 2023—just three months after her June 21, 2023 correspondence advancing discrimination claims against the College and two months after Dr. Sabic-El-Rayess reiterated the discrimination she experienced in a July 10, 2023 investigative interview—and that, as a result, there had been no reimbursement from DHS on Grant #137 from September 2023 to July 2024.

236.     During a meeting on October 2, 2024, Caroline Ebanks (TC's Vice Dean for Research) admitted that the College's failure to promptly request reimbursement on Grant #029 was "egregious" and Natasha Guadalupe (TC's Director of Sponsored Programs) told Dr. Sabic-El-Rayess: "You were not paid appropriately. It was a mess."

237.     But rather than fully take responsibility for these errors and their negative impact on Dr. Sabic-El-Rayess's relationship and reputation with DHS, TC instead criticized Dr. Sabic-El-Rayess for being insufficiently appreciative and suggested that she hire a financial manager to handle tasks associated with her grants.

238.    Before Dr. Sabic-El-Rayess filed the instant lawsuit, however, TC had never made this suggestion and had instead agreed to perform administrative tasks related to Dr. Sabic-El-Rayess's grants.

239.    As Ms. Ebanks acknowledged during the October 2, 2024 meeting, these adverse actions by TC have negatively impacted Dr. Sabic-El-Rayess's credibility and reputation with DHS, because Dr. Sabic-El-Rayess is the principal investigator and researcher on her grants.

240.    As a result of these errors, DHS has been less responsive to and communicative with Dr. Sabic-El-Rayess about her grants.

241.    TC's failures to properly request reimbursement have prejudiced the outcome of another grant application that Dr. Sabic-El-Rayess submitted to DHS. In late September 2024, Dr. Sabic-El-Rayess learned that she was not awarded what would have been her fourth consecutive grant from DHS.

242.    In oral and written communications in September and October 2024, Ms. Guadalupe and Ms. Ebanks informed Dr. Sabic-El-Rayess that their Office (the Office of Sponsored Programs), together with the Grants and Contracts Office (led by Mr. Hernandez), would be limiting their post-award support on Dr. Sabic-El-Rayess's grants moving forward.

243.    These retaliatory actions by TC regarding Dr. Sabic-El-Rayess's grants have damaged Dr. Sabic-El-Rayess's ability to apply for and receive future grants, and have diminished her reputation, credibility, career trajectory, and future income.

I.      TC Retaliated Against Dr. Sabic-El-Rayess by Withholding Her Fall 2024 Overage Pay

244.    As a professor who regularly conducts significant research funded by grants, Dr. Sabic-El-Rayess is eligible for overage pay from TC.

245.    On October 18, 2024, TC confirmed that Dr. Sabic-El-Rayess was owed $25,838 in overage pay, half ($12,919) to be paid during the fall 2024 semester, and the other half to be paid during the spring 2025 semester.

246.    However, on October 18, 2024—less than four months after Dr. Sabic-El-Rayess filed her Second Amended Complaint and less than three weeks after she met with Ms. Ebanks regarding TC's failure to properly request reimbursement on her grants—TC for the first time instructed Dr. Sabic-El-Rayess to obtain written approval from Ms. Ebanks to process her overage pay.

247.    On October 22, 2024, Dr. Sabic-El-Rayess emailed Ms. Ebanks, as she was instructed to do, to request approval to process her overage pay.

248.    Ms. Ebanks did not promptly respond to this email.

249.    Dr. Sabic-El-Rayess followed up by sending another email to Ms. Ebanks on November 9, 2024 and, after Ms. Ebanks again failed to respond, Dr. Sabic-El-Rayess sent another follow-up email to Ms. Ebanks on November 19, 2024.

250.    Although Ms. Ebanks eventually responded to Dr. Sabic-El-Rayess's emails regarding the overage pay that TC owes Dr. Sabic-El-Rayess for the fall 2024 semester, Ms. Ebanks only did so after Dr. Sabic-El-Rayess filed a Proposed Third Amended Complaint that accused TC of retaliating by withholding her overage pay. *See Sabic-El-Rayess v. Teachers Coll., Columbia Univ.*, No. 1:24-cv-02891-JMF, ECF No. 39-1 at ¶¶ 37, 244–252, 254, 287, 315, 331.

251.    TC's retaliation against Dr. Sabic-El-Rayess is pervasive and ongoing.

I.J.    TC's Conduct Has Caused Dr. Sabic-El-Rayess Significant and Irreparable Harm

235.252.    As a result of the unlawful conduct to which TC has subjected her, Dr. Sabic-El-Rayess has suffered significant losses.

236.253.    Dr. Sabic-El-Rayess has incurred substantial economic damages as a result of TC's discriminatory and retaliatory conduct in denying her the regular wage increase that President Bailey initially discussed with her in February 2023, in reducing her regular wages in 2023, and in repeatedly denying her tenure-track positions, in sabotaging her opportunities to receive research funding, and in withholding her overage pay.

237.254.    Dr. Sabic-El-Rayess has endured significant emotional distress as a result of the discrimination and retaliation that TC has inflicted on her.

238.255.    When Dr. Sabic-El-Rayess started working at the College, she was a confident, capable, and happy woman eager to contribute her talents to the largest and oldest graduate school of education in the country.

239.256.    As a result of TC's discriminatory and retaliatory conduct, however, she is now despondent, humiliated, and embarrassed.

240.    She worries constantly about her future, has lost confidence in her professional abilities, and is unable to enjoy the activities and relationships that she once did.

241.257.    As a result of TC's unlawful conduct, Dr. Sabic-El-Rayess has suffered acute emotional distress.

242.258.    Her symptoms of distress include, but are not limited to, a deep loss of self-esteem, nausea, anxiety, depression, fatigue, gastrointestinal problems, crying episodes, insomnia and recurring nightmares, heart palpitations, and social withdrawal.

259.    Since July 30, 2024, Dr. Sabic-El-Rayess has been receiving treatment from a mental health professional for her emotional distress.

243.260.    TC has also harmed Dr. Sabic-El-Rayess's reputation. The College's deliberate refusal to properly request reimbursement from DHS by the deadlinein connection with

Grant #029 and Grant #137 has damaged her credibility and standing with DHS, which has in turn made it less likely that Dr. Sabic-El-Rayess will be able to successfully pursue additional research funding from DHS in the future. In late September 2024, Dr. Sabic-El-Rayess learned that she had not been awarded what would have been her fourth consecutive grant from DHS.

244.261.    Dr. Sabic-El-Rayess has suffered irreparable injury for which a permanent injunction installing her into a tenure-track position at TC is the appropriate remedy.

245.262.    The College's refusal to grant her tenure-track status has damaged her career, livelihood, health, and reputation in a multitude of large and small ways that remedies available at law, such as monetary damages, would be inadequate to rectify.

246.263.    Without tenure-track status, Dr. Sabic-El-Rayess (a) loses out on significant non-monetary benefits, such as housing and the ability to serve on certain committees; and (b) suffers from reputational damage that has far-reaching ripple effects throughout her professional networks.

247.264.    Considering the balance of respective hardships between TC and Dr. Sabic-El-Rayess, a remedy in equity is warranted.

248.265.    The public interest would not be disserved by a permanent injunction installing Dr. Sabic-El-Rayess into a tenure-track position at TC.

249.266.    Such an injunction would further society's interest in combatting unlawful discrimination and retaliation.

V.    <u>COUNTS</u>

<u>COUNT ONE</u>
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**
**RELIGION/CREED DISCRIMINATION**
**New York City Administrative Code § 8-107(1)(a)**

~~250.~~267.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

~~251.~~268.    Plaintiff was and is a Muslim employee of Defendant.

~~252.~~269.    Defendant was and is Plaintiff's employer within the meaning of the New York City Human Rights Law.

~~253.~~270.    Defendant subjected Plaintiff to discrimination in the terms, conditions, and privileges of employment in violation of the New York City Human Rights Law, including failing to promote her based on her religion/creed, refusing to increase her regular wages and reducing her regular wages based on her religion/creed, and disinviting her from delivering opening remarks at and excluding her entirely from the Global Peace & Education Symposium based on her religion/creed.

~~254.~~271.    Defendant has treated Plaintiff less well than other employees at least in part because of her religion/creed (Muslim) in a manner unrelated to academic considerations.

~~255.~~272.    Based at least in part on her religion/creed, Plaintiff was treated differently from and worse than others in a way that was more than trivial, insubstantial, or petty.

~~256.~~273.    By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

257.274.    Defendant's actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

258.275.    Accordingly, Plaintiff is entitled to punitive damages.

259.276.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

260.277.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendant, entitle Plaintiff to an equitable remedy such as a permanent injunction, which would not disserve the public.

261.278.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

## COUNT TWO
### VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW
### AGE DISCRIMINATION
### New York City Administrative Code § 8-107(1)(a)

262.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

263.    Plaintiff was and is an employee of Defendant who is over the age of 40.

264.    Defendant was and is Plaintiff's employer within the meaning of the New York City Human Rights Law.

265.    Defendant subjected Plaintiff to discrimination in the terms, conditions, and privileges of employment in violation of the New York City Human Rights Law, including age-based failure to promote and pay discrimination.

266.    Defendant has treated Plaintiff differently from and less preferably than younger employees in a manner unrelated to academic considerations. Upon information and belief, nearly every single one of the non-Muslim individuals promoted to tenure-track and/or tenured status — including Noah Drezner, Ansley Erickson, Rajashi Ghosh, Nicholas Limerick, Jordan Matsudaira, Mary Mendenhall, and Oren Pizmony-Levy — was younger than Plaintiff at the time of his or her promotion to tenure-track and/or tenured status.

267.    Based at least in part on her age, Plaintiff was treated differently from and worse than others in a way that was more than trivial, insubstantial, or petty.

268.    By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

269.    Defendant's actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

270.    Accordingly, Plaintiff is entitled to punitive damages.

271.1.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

272.1.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of

hardships between Plaintiff and Defendant, entitle Plaintiff to an equitable remedy such as a permanent injunction, which would not disserve the public.

273.1.   As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

**COUNT THREE**

**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**

**RETALIATION**

**New York City Administrative Code § 8-107(7)**

274.279.      Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

275.280.      Plaintiff was and is a Muslim employee of Defendant who is over the age of 40.

276.281.      Defendant was and is Plaintiff's employer within the meaning of the New York City Human Rights Law.

277.282.      Plaintiff engaged in protected activity and Defendant was aware of Plaintiff's protected activity.

278.283.      Among other things, Plaintiff opposed the unlawful treatment to which she was being subjected by (a) complaining to various employees and agents of Defendant; (b) threatening to bring a lawsuit alleging religion/creed discrimination, age discrimination, and retaliation against Defendant; and (c) bringing a lawsuit alleging religion/creed discrimination, age discrimination, and retaliation against Defendant.

279.284.      The practices opposed by Plaintiff constitute colorable violations of the New York City Human Rights Law.

280.285.    Plaintiff suffered actions that would be reasonably likely to deter a person from engaging in protected activity.

281.286.    Among other things, Defendant (a) stopped communicating with Plaintiff concerning a contemplated regular wage increase in 2023 and ultimately did not increase her regular wages; (b) reduced Plaintiff's regular wages in 2023; (c) rejected her requests for a promotion to tenure-track status, including as recently as March 2024; (d) abruptly rescinded its invitation to Plaintiff to speak at and excluded her entirely from the Global Peace & Education Symposium; and (e) repeatedly failed to promptlyproperly request reimbursement on Plaintiff's DHS grants; (f) suggested to Plaintiff that she hire a financial manager to handle grant-related tasks that Defendant had agreed to handle prior to the filing of this lawsuit; and (g) withheld Plaintiff's fall 2024 overage pay.

282.287.    There was a causal connection between Plaintiff's protected activities and Defendant's actions.

283.288.    Defendant subjected Plaintiff to such actions because of and in retaliation for Plaintiff's protected activities in a manner unrelated to academic considerations.

284.289.    By reason of the continuous nature of Defendant's retaliatory conduct, Plaintiff is entitled to application of the continuing violation doctrine to the unlawful acts alleged herein.

285.290.    Defendant's actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

286.291.    Accordingly, Plaintiff is entitled to punitive damages.

292.   As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

293.   Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendant, entitle Plaintiff to an equitable remedy such as a permanent injunction, which would not disserve the public.

294.   As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

**COUNT THREE**

287.

288.   Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendant, entitle Plaintiff to an equitable remedy such as a permanent injunction, which would not disserve the public.

289.   As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

**COUNT FOUR**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000e-2(a)(1)**

45

**RELIGIOUS DISCRIMINATION**

~~290.~~295.        Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

~~291.~~296.        Plaintiff was and is a Muslim employee of Defendant.

~~292.~~297.        Defendant was and is Plaintiff's employer within the meaning of Title VII of the Civil Rights Act of 1964.

~~293.~~298.        Defendant subjected Plaintiff to discrimination in the terms, conditions, and privileges of employment in violation of Title VII of the Civil Rights Act of 1964, including failing to promote her based on her religion, refusing to increase her regular wages and reducing her regular wages based on her religion, and disinviting her from delivering opening remarks at and excluding her entirely from the Global Peace & Education Symposium based on her religion.

~~294.~~299.        Defendant has treated Plaintiff differently from and less preferably than non-Muslim employees in a manner unrelated to academic considerations.

~~295.~~300.        Plaintiff's religion has been a determining factor in Defendant's subjecting Plaintiff to discrimination in the terms, conditions, and privileges of employment.

~~296.~~301.        By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

~~297.~~302.        Defendant's actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

~~298.~~303.        Accordingly, Plaintiff is entitled to punitive damages.

~~299.~~304.        As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future

employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

300.305.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendant, entitle Plaintiff to an equitable remedy such as a permanent injunction, which would not disserve the public.

301.306.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of Title VII of the Civil Rights Act of 1964, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

~~COUNT FIVE~~
COUNT FOUR
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000e-3(a)**
**RETALIATION**

302.307.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

303.308.    Plaintiff was and is a Muslim employee of Defendant.

304.309.    Defendant was and is Plaintiff's employer within the meaning of Title VII of the Civil Rights Act of 1964.

305.310.    Plaintiff engaged in protected activity and Defendant was aware of Plaintiff's protected activity.

306.311.    Among other things, Plaintiff opposed the unlawful treatment to which she was being subjected by (a) complaining to various employees and agents of Defendant; (b)

threatening to bring a lawsuit alleging religious discrimination and retaliation against Defendant; and (c) bringing a lawsuit alleging religious discrimination and retaliation against Defendant.

307.312.    The practices opposed by Plaintiff constitute colorable violations of Title VII of the Civil Rights Act of 1964.

308.313.    Plaintiff suffered actions that would be reasonably likely to deter a person from engaging in protected activity.

309.314.    Among other things, Defendant (a) stopped communicating with Plaintiff concerning a contemplated regular wage increase in 2023 and ultimately did not increase her regular wages; (b) reduced Plaintiff's regular wages in 2023; (c) rejected her requests for a promotion to tenure-track status, including as recently as March 2024; (d) abruptly rescinded its invitation to Plaintiff to speak at and excluded her entirely from the Global Peace & Education Symposium; and (e) repeatedly failed to promptlyproperly request reimbursement on Plaintiff's DHS grants; (f) suggested to Plaintiff that she hire a financial manager to handle grant-related tasks that Defendant had agreed to handle prior to the filing of this lawsuit; and (g) withheld Plaintiff's fall 2024 overage pay.

310.315.    There was a causal connection between Plaintiff's protected activities and Defendant's actions.

311.316.    Defendant subjected Plaintiff to such actions because of and in retaliation for Plaintiff's protected activities in a manner unrelated to academic considerations.

312.317.    By reason of the continuous nature of Defendant's retaliatory conduct, Plaintiff is entitled to application of the continuing violation doctrine to the unlawful acts alleged herein.

313.318.    Defendant's actions amount to willful or wanton negligence and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

314.319.    Accordingly, Plaintiff is entitled to punitive damages.

315.320.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

316.321.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendant, entitle Plaintiff to an equitable remedy such as a permanent injunction, which would not disserve the public.

317.322.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of Title VII of the Civil Rights Act of 1964, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

**COUNT FIVE**

**COUNT SIX**
**VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967**
**29 U.S.C. § 623(a)(1)**
**AGE DISCRIMINATION**

318.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

319.1.    Plaintiff was and is an employee of Defendant who is over the age of 40.

49

320.1.  Defendant was and is Plaintiff's employer within the meaning of the Age Discrimination in Employment Act of 1967.

321.    Defendant subjected Plaintiff to discrimination in the terms, conditions, and privileges of employment in violation of the Age Discrimination in Employment Act of 1967, including age-based failure to promote and pay discrimination.

322.    Defendant has treated Plaintiff differently from and less preferably than younger employees in a manner unrelated to academic considerations.  Upon information and belief, nearly every single one of the non-Muslim individuals promoted to tenure-track and/or tenured status — including Noah Drezner, Ansley Erickson, Rajashi Ghosh, Nicholas Limerick, Jordan Matsudaira, Mary Mendenhall, and Oren Pizmony-Levy — was younger than Plaintiff at the time of his or her promotion to tenure-track and/or tenured status.

323.    Plaintiff's age has been a determining factor in Defendant's subjecting of Plaintiff to discrimination in the terms, conditions, and privileges of employment.

324.    By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

325.    Defendant's actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

326.    Accordingly, Plaintiff is entitled to liquidated damages.

327.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, and other economic damages.

328.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendant, entitle Plaintiff to an equitable remedy such as a permanent injunction, which would not disserve the public.

329.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the Age Discrimination in Employment Act of 1967, including injunctive relief, back pay, front pay (if injunctive relief is denied), liquidated damages, attorneys' fees and costs, and/or other appropriate relief.

## COUNT SEVEN
### VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967
### 29 U.S.C. § 623(d)
### RETALIATION

330.323.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

331.    Plaintiff was and is an employee of Defendant who is over the age of 40.

332.    Defendant was and is Plaintiff's employer within the meaning of the Age Discrimination in Employment Act of 1967.

324.

325.    Defendant was and is Plaintiff's employer within the meaning of the Age Discrimination in Employment Act of 1967.

333.326.    Plaintiff engaged in protected activity and Defendant was aware of Plaintiff's protected activity.

334.327.    Among other things, Plaintiff opposed the unlawful treatment to which she was being subjected by (a) complaining to various employees and agents of Defendant; (b)

threatening to bring a lawsuit alleging age discrimination and retaliation against Defendant; and (c) bringing a lawsuit alleging age discrimination and retaliation against Defendant.

335.328.    The practices opposed by Plaintiff constitute colorable violations of the Age Discrimination in Employment Act of 1967.

336.329.    Plaintiff suffered actions that would be reasonably likely to deter a person from engaging in protected activity.

337.330.    Among other things, Defendant (a) stopped communicating with Plaintiff concerning a contemplated regular wage increase in 2023 and ultimately did not increase her regular wages; (b) reduced Plaintiff's regular wages in 2023; (c) rejected her requests for a promotion to tenure-track status, including as recently as March 2024; (d) abruptly rescinded its invitation to Plaintiff to speak at and excluded her entirely from the Global Peace & Education Symposium; and (e) repeatedly failed to promptlyproperly request reimbursement on Plaintiff's DHS grants; (f) suggested to Plaintiff that she hire a financial manager to handle grant-related tasks that Defendant had agreed to handle prior to the filing of this lawsuit; and (g) withheld Plaintiff's fall 2024 overage pay.

338.331.    There was a causal connection between Plaintiff's protected activities and Defendant's actions.

339.332.    Defendant subjected Plaintiff to such actions because of and in retaliation for Plaintiff's protected activities in a manner unrelated to academic considerations.

340.333.    By reason of the continuous nature of Defendant's retaliatory conduct, Plaintiff is entitled to application of the continuing violation doctrine to the unlawful acts alleged herein.

341.334.    Defendant's actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

342.335.    Accordingly, Plaintiff is entitled to liquidated damages.

343.336.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, and other economic damages.

344.337.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendant, entitle Plaintiff to an equitable remedy such as a permanent injunction, which would not disserve the public.

345.338.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the Age Discrimination in Employment Act of 1967, including injunctive relief, back pay, front pay (if injunctive relief is denied), liquidated damages, attorneys' fees and costs, and/or other appropriate relief.

## VI.    **PRAYER FOR RELIEF**

Wherefore, Plaintiff requests the following relief:

a.    acceptance of jurisdiction of this case;

a.    a declaratory judgment that the practices complained of herein are unlawful and violate the New York City Human Rights Law, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967;

b.    a permanent injunction instating Plaintiff into a tenure-track position at Defendant;

    c.      an award of damages to Plaintiff, including back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, and liquidated damages in an amount not less than $10,000,000.00;

    d.      an award of litigation costs and expenses, including reasonable attorneys' fees;

    e.      an award of pre-judgment and post-judgment interest; and

    f.      such other and further relief as the Court may deem just and proper.

## VII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable of right to a jury.

Dated: ~~June 26, 2024~~ January 27, 2025          Respectfully submitted,

                                 */s/ Alok Nadig*
                                   ALOK NADIG
                                   DAVID SANFORD
                                   MICHAEL PALMER
                                   **SANFORD HEISLER SHARP McKNIGHT, LLP**
                                   17 State Street, 37th Floor
                                   New York, New York 10004
                                   Telephone: (646) 402-5650
                                   anadig@sanfordheisler.com
                                   dsanford@sanfordheisler.com

~~HODA KATEBI (admitted *pro hac vice*)~~
~~**SANFORD HEISLER SHARP, LLP**~~
~~300 Hamilton Avenue, 5th Floor~~
~~Palo Alto, CA 94301~~
~~Telephone: (650) 547-5990~~
~~hkatebi@sanfordheisler.com~~

~~THIRU VIGNARAJAH (*pro hac vice* forthcoming)~~
~~**SANFORD HEISLER SHARP, LLP**~~
~~111 Calvert Street, Suite 1950~~
~~Baltimore, MD 21202~~
~~Telephone: (410) 291-7090~~
~~tvignarajah@sanfordheisler.com~~

mpalmer@sanfordheisler.com

*Attorneys for Plaintiff Dr. Amra Sabic-El-Rayess*